UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN
_____

In re:

NICHOLAS M. ZAGOTTA,

       Debtor.

_____/

THOMAS A. BRUINSMA,

       Plaintiff,

-vs-

NICHOLAS M. ZAGOTTA,
JAMIE L. ZAGOTTA, individually and as Trustee
of the JAMIE L. ZAGOTTA REVOCABLE TRUST
dated December 19, 2016, and
All Other Occupants of 3794 Lake Birch
Street, N.E., Grand Rapids, Michigan 49525,

       Defendants.

_____/

Case No. BG 20-00242
Chapter 7

Adversary Proceeding
No. 20-80169

**OPINION REGARDING
CROSS MOTIONS FOR SUMMARY JUDGMENT**

Appearances:

Emily S. Rucker, Grand Rapids, Michigan, attorney for Plaintiff Thomas A. Bruinsma.

Nicholas S. Laue and A. Todd Almassian, Grand Rapids, Michigan, attorneys for
      Defendants Nicholas M. Zagotta, Jamie L. Zagotta, individually and as Trustee of
      the Jamie L. Zagotta Revocable Trust dated December 19, 2016, and all other
      occupants of 3794 Lake Birch Street, N.E., Grand Rapids, Michigan 49525.[1]

---

[1]     The "other occupants" of the home in Grand Rapids, Michigan were named as defendants in both the original and the amended complaint. The answer was also filed on their behalf. However, the amended complaint does not include any factual allegations against these "other occupants" and do not seek any specific relief against them. As a result, these parties are omitted from the analysis in this opinion.

1

I.     INTRODUCTION AND JURISDICTION.

This adversary proceeding involves claims for avoidance of an alleged fraudulent transfer and imposition of a constructive trust brought by Chapter 7 Trustee Thomas A. Bruinsma (the "Plaintiff" or "Trustee") against Nicholas M. Zagotta (the "Debtor"), his wife, Jamie L. Zagotta ("Mrs. Zagotta"), and her revocable trust.  The Trustee's claims generally arise out of a transaction that occurred in 2015, wherein the Debtor and his business partner procured a multi-million dollar investment in their newly formed entity, Content Curation and Data Asset Management ("CCDM"), from Alfred Koplin and his entity Jorie, LP.  The Debtor and his partner convinced Koplin to invest in their new business by representing that CCDM had a lucrative contract with International Business Machines ("IBM").  As it turned out, that contract never existed.  Notwithstanding, the Debtor and Mrs. Zagotta (sometimes referred to collectively as the "Defendants") almost immediately used a portion of the proceeds of Jorie's initial investment in CCDM to purchase a home in Illinois as tenants by the entirety.  The Trustee's complaint seeks to avoid that purchase as a fraudulent transfer under § 544(b) of the Bankruptcy Code[2] and the Illinois Uniform Fraudulent Transfer Act ("UFTA").  Alternatively, the Trustee asks this court to impose a constructive trust on the Defendants' current home in Michigan based on the assertion that the initial purchase, along with the subsequent transfer of the property to Mrs. Zagotta's trust, and use of the proceeds to purchase the Michigan property, unjustly enriched Mrs. Zagotta.

---

[2]     The Bankruptcy Code is set forth in 11 U.S.C. §§ 101-1532 inclusive.  Specific provisions of the Bankruptcy Code are referred to in this opinion as "§ ___."

In the cross motions for summary judgment currently before the court, the Trustee seeks summary judgment on his constructive trust claims, arguing that there are no disputed material facts regarding Mrs. Zagotta's lack of financial contribution in acquiring the properties.  The Defendants dispute this assertion, arguing instead that the Trustee has failed to establish that the Mrs. Zagotta was unjustly enriched at the Debtor's expense by the transactions at issue.  The Defendants' summary judgment motion asserts that the Trustee's fraudulent transfer claim was not timely under the four year statute of limitations set forth in the Illinois UFTA and that the Trustee has failed to meet the "sole intent" standard that applies to avoidance of fraudulent transfers of property to the entirety under Illinois law.  Accordingly, the Defendants' counter motion requests entry of summary judgment in their favor on all of the Trustee's claims.

This court has jurisdiction over the chapter 7 base case.  28 U.S.C. § 1334.  The case, and all related proceedings and contested matters, have been referred to this bankruptcy court for determination.  28 U.S.C. § 157(a); LGenR 3.1(a) (W.D. Mich.).  The claim for avoidance and recovery of the fraudulent transfer alleged in the Trustee's complaint arises under the Bankruptcy Code and constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(H).  *See* Joint Discovery Plan, AP Dkt. No. 30, at ¶ 5(d)(1).  The parties and the court agree that the unjust enrichment and turnover claims alleged in the complaint are, at a minimum, non-core proceedings that are related to the bankruptcy case.  28 U.S.C. § 157(c)(1)-(2); Joint Discovery Plan, at ¶ 5(d)(3).  Both parties have consented to this court entering final orders on all claims alleged in this adversary proceeding.  Joint Discovery Plan, at ¶ 5(e).

3

## II.    UNDISPUTED MATERIAL FACTS.

The following factual summary is derived primarily from the Statements of Undisputed Material Facts filed by the parties in support of their respective motions.[3]  The facts are generally not disputed, except as noted herein.

### A.  *Defendants' Background and Finances*.

The Debtor and Mrs. Zagotta married in 2013, and moved to Chicago, Illinois.  (Dft. Facts, at ¶ 1.)  At that time, the Debtor practiced law in the Chicago area and Mrs. Zagotta worked at a fine jewelry store, earning an income of approximately $20,000 to $30,000 per year.  (Dft. Facts, at ¶ 2; Dft. Exh. A at p. 8-9.)  Mrs. Zagotta stopped working when she and the Debtor welcomed their first child in 2014 and has not worked outside of the home since that time.  (Dft. Facts, at ¶ 3, 5.)  The Defendants had two more children in 2015 and 2016, respectively.  (Dft. Facts, at ¶ 4.)

Mrs. Zagotta did not own any real property or other significant assets when she married the Debtor in 2013.  (Plf. Facts, at ¶ 52.)  Since Mrs. Zagotta left her job at the jewelry store in 2014, she has not brought any income into the household.  (Plf. Facts, at ¶ 51.)  She also has not received any inheritances or substantial gifts and has not liquidated any personal property since she has been married.  (Plf. Facts, at ¶ 53; Dft.

---

[3]      *See* Statement of Material Undisputed Facts in Support of Plaintiff Chapter 7 Trustee Thomas A. Bruinsma's Partial Motion for Summary Judgement, AP Dkt. No. 46-1 (cited herein as "Plf. Facts, at ¶ __."); Defendants' Supplement to Their Motion for Summary Judgment – Statement of Undisputed Material Facts, AP Dkt. No. 47 (cited herein as "Dft. Facts, at ¶ __.").
        To the extent the parties' statements of fact disagree on minor details or characterize facts slightly differently, the court will occasionally cite to the exhibits filed in support of the summary judgment motions.  The Plaintiff's exhibits are attached to his Brief in Support of Motion for Partial Summary Judgment, AP Dkt. No. 46 (cited herein as "Plf. Exh. __").  The Defendants' exhibits are attached to their Brief in Support of Motion for Summary Judgment, AP Dkt. No. 44 (cited herein as "Dft. Exh. __").

Exh. A at p. 52-53.)  In short, all of the expenses for the Defendants' family are funded by the Debtor's income and Mrs. Zagotta is a stay-at-home parent.  (Dft. Exh. A at p. 11.)

B. *Formation of CCDM and Solicitation of Initial Investment from Koplin*.

In June 2014, the Debtor and Christopher Johnson formed a limited liability company called Content Curation and Data Asset Management.  (Dft. Exh. C.)  CCDM performed technology consulting services early in its existence, but later focused its attention on licensing technology.  (Plf. Facts, at ¶ 4.)  Johnson was responsible for the technical aspects of the business, while the Debtor acted as the attorney for CCDM and generally ensured that Johnson met his obligations to clients.  (Dft. Facts, at ¶ 8; Dft. Exh. B at p. 11-13.)

Alfred Koplin is a Chicago-area investor who the Debtor became acquainted with through his father, Nicholas C. Zagotta, and his father's law firm, Roberts McGivney Zagotta, LLC.  (Plf. Facts, at ¶ 6-7.)  The Debtor initially approached Koplin for advice on taking CCDM's business to the "next level", but those discussions eventually turned into a conversation about Koplin investing in CCDM.  (Plf. Facts, at ¶ 8-9.)  In the first half of September 2015, the Debtor, his father, and Johnson met with Koplin to discuss the potential investment.  (Plf. Facts, at ¶ 10.)  At this meeting, Johnson advised Koplin that CCDM had an agreement with IBM under which CCDM had "sold a set of algorithms to IBM that allows their cloud computing system to work more [efficiently]."  (Plf. Facts, at ¶ 10; Plf. Exh. 2, at p. 34.)

After the meeting, negotiations and an exchange of information continued between the parties.  Koplin retained counsel and signed a nondisclosure agreement on September 17, 2015.  (Plf. Facts, at ¶ 11; Dft. Facts, at ¶ 12.)  The Debtor then emailed

a copy of what appeared to be a Software License Agreement between CCDM and IBM to his counsel, who forwarded the purported contract to Koplin's counsel.  (Plf. Facts, at ¶ 12-13; Plf. Exhs. 4 & 5.)  The purported IBM contract was signed by Laura Thompson, who is listed as an executive officer for IBM.  (Plf. Facts, at ¶ 14.)  Thompson is also Johnson's aunt.  (Plf. Facts, at ¶ 15.)  In addition to the contract, the Debtor provided Koplin, through their respective counsel, several other documents purporting to establish that Thompson had authority to sign the contract on IBM's behalf and to otherwise validate the contractual relationship between CCDM and IBM.  (Plf. Facts, at ¶ 17-19.)  The Debtor also told Koplin that CCDM had a contract with IBM on multiple occasions.  (Plf. Facts, at ¶ 24.)

Koplin ultimately formed a limited partnership, Jorie, LP, to invest in CCDM by purchasing a membership interest in the company.  (Dft. Facts, at ¶ 14-15.)  Jorie invested its first $2,750,000 into CCDM on September 29, 2015.  (Plf. Facts, at ¶ 26.)  That same day, the Debtor signed a check on behalf of CCDM, and payable to himself, in the amount of $1,225,000 and deposited the check in his "Law Offices of Nicholas M. Zagotta" bank account at Lakeside Bank.  (Plf. Facts, at ¶ 27; Dft. Facts, at ¶ 17; Plf. Exh. 13.)  According to the Debtor, this payment was consideration for the sale of the Debtor's membership interest in CCDM.  (Dft. Facts, at ¶ 17.)  CCDM received a second investment from Jorie in the amount of $2,950,000 on November 2, 2015.  (Plf. Facts, at ¶ 28.)  The next day, the Debtor received a $1,400,000 wire transfer from CCDM.  (Plf. Facts, at ¶ 29.)

C.  *Purchase of the Illinois Property*.

Approximately two weeks after receiving his portion of Jorie's initial investment in CCDM, the Debtor used $895,000 of the funds in his law office bank account to purchase

real property located at 1453 South Prairie Avenue, Unit A-91, in Chicago, Illinois (the "Illinois Property").  (Dft. Facts, at ¶ 18-19.)  The deed, dated October 15, 2015, shows that the Debtor and Mrs. Zagotta acquired the property "as husband and wife, tenants by the entirety."  (Dft. Exh. G.)  The total purchase price was $949,000, and the closing statement shows that the Debtor and Mrs. Zagotta made an initial $50,000 earnest money deposit.  (Dft. Exh. H.)  The source of the $50,000 is not clear from the summary judgment record.[4]  It is undisputed that the Debtor and Mrs. Zagotta would not have been able to purchase the Illinois Property as they did (i.e., for cash and without incurring new debt) without the money that derived from the Jorie investment in CCDM.  (Plf. Facts, at ¶ 50.)

In deposition testimony provided in connection with this adversary proceeding, the Debtor identified several factors which prompted the Defendants to purchase the Illinois Property.  Prior to the purchase, the Defendants were living in a high-rise apartment and paying rent.  (Dft. Exh. B, at p. 39-40; Dft. Facts, at ¶ 6.)  At the time, they had one child, but were hoping to expand their family, and believed that apartment living was not suitable for their growing family.  (Dft. Exh. B, at p. 40.)  The Debtor also stated that he believed he could afford to purchase the property, because he "had this IBM deal going on" at the time, and "everybody was under the realistic impression that there was a lot of money to be made off the license agreement."  (*Id.*)

After the Defendants purchased the Illinois Property, the Debtor paid all expenses associated with the property, including the utilities, homeowner's insurance, property

---

[4]   In his response to the Defendants' statement of undisputed facts, the Trustee suggests that $35,000 of this down payment may have come from the Debtor's law office account.  Although the bank statement for the law office account shows that a $35,000 wire transfer was made to Home Services of Illinois, LLC, on October 13, 2015, there is no other information regarding this transfer in the record.  (Plf. Exh. 13.)

taxes, condominium fees, and housekeeping.  (Plf. Facts, at ¶ 57.)  The Defendants also performed some renovations or remodeling at the property, including a new kitchen, new tile in the bathrooms, and other upgrades.  (Plf. Facts, at ¶ 58; Dft. Exh. A, at p. 23-31.)  Most of these improvements were paid for from their joint checking account, but some were paid from the Debtor's law office account.  (Plf. Facts, at ¶ 59.)

   D.  *Jamie L. Zagotta Revocable Trust*.

   In 2016, the Defendants' financial advisor recommended that they consult an estate planning attorney.  (Plf. Facts, at ¶ 64; Dft. Facts, at ¶ 20.)  The attorney they retained, Joseph Zarlengo, recommended that the Illinois Property be placed in a revocable trust.  (Dft. Facts, at ¶ 21.)  Soon thereafter, The Jamie L. Zagotta Revocable Trust dated December 19, 2016 (the "Trust") was created.  The Defendants transferred the Illinois Property to the Trust almost immediately.  (Plf. Facts, at ¶ 65-66; Dft. Facts, at ¶ 22-23.)

   E.  *The Illinois Lawsuit*.

   On June 26, 2017, Jorie and Koplin filed a lawsuit against the Debtor, Johnson, the Debtor's father, the father's law firm, and CCDM in the DuPage County, Illinois Circuit Court (the "Illinois Lawsuit").[5]  (Dft. Facts, at ¶ 24.)  The claims asserted in the Illinois Lawsuit included fraudulent inducement, breach of fiduciary duty, unjust enrichment, civil conspiracy, unlawful distribution, and breach of contract.  (Dft. Facts, at ¶ 25.)  Discovery taken early on in the lawsuit included deposition testimony from Laura Thompson, who disavowed any involvement with or specific knowledge of a purported contract between

---

[5]   The First Amended Complaint dated March 2018 shows that CCDM was designated as a "relief plaintiff" and was not named as a defendant.  (*See* Plf. Exh. 15.)  This distinction is not relevant to the issues before this court.

8

CCDM and IBM.  (Plf. Facts, at ¶ 35, 38, 40.)  In short, it became clear that that the IBM contract was fraudulent and never really existed.  (Plf. Facts, at ¶ 35-41, 43-44.)

F.   *Purchase of the Michigan Property*.

In 2019, while the Illinois lawsuit was pending, the Defendants moved to Michigan. The Trust sold the Illinois Property for $1,135,000 on April 29, 2019.  (Plf. Facts, at ¶ 71; Dft. Facts, at ¶ 27.)  Approximately $300,000 of the sale proceeds were used by the Defendants to pay off a loan taken by the Debtor individually in March 2019 and which was secured by a mortgage on the Illinois Property.  (Plf. Facts, at ¶ 72.)  The remaining $722,712.52 in sale proceeds were used by the Trust to purchase property located at 3794 Lake Birch Street in Grand Rapids, Michigan (the "Michigan Property").  (Plf. Facts, at ¶ 74; Plf. Exh. 25.)  The purchase of the Michigan Property occurred on April 30, 2019, and the total purchase price was $760,000.  (Dft. Facts, at ¶ 28.)

G.   *Illinois Court Orders*.

On August 6, 2019, following argument on the parties' cross-motions for summary judgment in the Illinois Lawsuit, the state court entered a liability judgment against the Debtor on the unjust enrichment count of Jorie's amended complaint.  (Plf. Facts, at ¶ 78; Plf. Exh. 26.)  The Illinois state court subsequently entered a $2,625,000 money judgment against the Debtor on August 26, 2019.  (Plf. Facts, at ¶ 79; Plf. Exh. 27.)  The state court also entered an order imposing a constructive trust on the Michigan Property for Jorie's benefit on August 30, 2019.  (Plf. Facts, at ¶ 81; Plf. Exh. 28.)  The Defendants point out, and the Plaintiff does not dispute, that the constructive trust was imposed despite the fact that neither Mrs. Zagotta nor her Trust were parties to the Illinois Lawsuit.  (Dft. Facts, at ¶ 25.)

9

On September 16, 2019, Jorie filed a motion for turnover in the Illinois Lawsuit, seeking an order compelling the Debtor to deliver title to the Michigan Property to Jorie within fourteen days.  (Plf. Facts, at ¶ 82-83; Plf. Exh. 29.)  The state court granted the turnover motion on October 9, 2019, and entered an order requiring the Debtor to "immediately turn over deed, title, and possession" of the Michigan Property.  (Plf. Facts, at ¶ 84; Plf. Exh. 32.)  The order was subsequently amended on October 28, 2019, to require the Debtor to "take all necessary actions required [to effectuate turnover of the Michigan Property], including but not limited to, making written direction to his wife, Jamie L. Zagotta."  (Plf. Facts, at ¶ 86; Plf. Exh. 32.)

The Debtor made written direction to Mrs. Zagotta after entry of the amended turnover order.  (Dft. Facts, at ¶ 32.)  On the advice of her attorney, Mrs. Zagotta did not take any action in response to the Debtor's request.  (Dft. Facts, at ¶ 33.)  As a result, the Michigan Property was never turned over to Jorie despite the state court orders.

H.   *The Debtor's Bankruptcy Filing and the Jorie Assignment*.

The Debtor filed a voluntary chapter 7 petition on January 23, 2020.  (Plf. Facts, at ¶ 88; Dft. Facts, at ¶ 34.)  On February 21, 2020, Jorie and Koplin filed a motion for relief from stay in this court to allow them to proceed to trial on the two remaining claims in the Illinois Lawsuit, fraudulent inducement and breach of fiduciary duty.  (Dft. Facts, at ¶ 36.)  This court granted the motion, and the remaining claims in the Illinois Lawsuit were tried in August 2020.

After the conclusion of trial, the Illinois court found for the Debtor and the other remaining defendants on both the fraudulent inducement and breach of fiduciary duty claims.  (Dft. Facts, at ¶ 39; Dft. Exh. Q.)  In its discussion of the fraudulent inducement

10

claims, the state court specifically stated:  "It appears that no one involved in [the initial investment] transaction, with the exception of Johnson, suspected that the IBM contract was fraudulent."  (Dft. Exh. Q, at p. 2.)

In October 2020, Jorie, Koplin and the Trustee entered into a settlement agreement pursuant to which Jorie transferred "its right, title and interest in any constructive trust held by it on the [Michigan Property] and/or any other property owned by the Debtor, the Debtor's spouse and/or her Trust" to the bankruptcy estate.  (Base Case Dkt. No. 69, at p. 5.)  The agreement also stated that the estate would be "vested with the rights and powers of Jorie to pursue an action for constructive trust."  (*Id*.)  In exchange, the agreement provided that, after payment of fees and expenses, Jorie would receive fifty percent of any recovery on the claims in satisfaction of its "secured claim" which the agreement explained was "deemed secured as the original holder of the constructive trust claim."  (*Id*.)  The remaining fifty percent of the proceeds was to be distributed to unsecured creditors, including Jorie to the extent it held an unsecured deficiency claim.  (*Id*.)  This court entered an order approving the settlement agreement on November 25, 2020.  (Base Case Dkt. No. 71; Plf. Facts, at ¶ 94-95.)

This adversary proceeding was filed on December 18, 2020.  (Dft. Facts, at ¶ 40.) The Trustee's amended complaint includes claims for turnover of the Michigan Property, presumably based on the prior state court order imposing a constructive trust on the property, as well as stand-alone claims for unjust enrichment and imposition of a constructive trust against the Defendants.  It also seeks avoidance and recovery of the initial transfer of funds from the Debtor to purchase the Illinois Property with Mrs. Zagotta as tenants by the entirety in October 2015.

11

The cross motions for summary judgment that are currently before the court were filed by the parties in May of 2022.  (AP Dkt. Nos. 43 & 45.)  A hearing on the summary judgment motions was held on June 30, 2022.[6]  Both parties filed supplemental legal memoranda after the conclusion of the hearing.  (AP Dkt. Nos. 57 & 58.)

## III.    DISCUSSION.

### A. *Summary Judgment Standard*.

Federal Rule of Civil Procedure 56(a), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056, governs motions for summary judgment.  The Rule provides that "[a] party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought" and that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Accordingly, the summary judgment analysis is a "threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505 (1986).

Upon motion, and assuming there has been adequate time for discovery, Rule 56 essentially "mandates the entry of summary judgment" against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case,

---

6       The transcript of the summary judgment hearing is available on the court's docket at AP Dkt. No. 59 and is cited herein as "Tr. at __."

12

and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986). "The initial burden is on the moving party to demonstrate that an essential element of the non-moving party's case is lacking." *Kalamazoo River Study Group v. Rockwell Int'l Corp*., 171 F.3d 1065, 1068 (6th Cir. 1999) (citing *Celotex Corp.*, 477 U.S. at 322-23). The burden then shifts to the non-moving party to come forward with "specific facts showing there is a genuine issue for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S. Ct. 1348 (1986) (citation and emphasis omitted). To meet this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts" and instead must point to specific facts in the record that could "lead a rational trier of fact to find for the non-moving party." *Matsushita Electric*, 475 U.S. at 586-87.

When a court reviews cross-motions for summary judgment, it "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). Denial of one party's motion for summary judgment does not automatically compel the conclusion that the other party is entitled to summary judgment. *B.F. Goodrich Co. v. United States Filter Corp.*, 245 F.3d 587, 593 (6th Cir. 2001).

B.   *Applicable Choice of Law Rules*.

Although the Trustee's claims in this adversary proceeding have been brought in the context of the Debtor's federal bankruptcy case, both the fraudulent transfer and unjust enrichment causes of action rely on applicable state law to define the parties' underlying rights and obligations. *See, e.g., Butner v. United States*, 440 U.S. 48, 54-55, 99 S. Ct. 914 (1979) (property rights "are created and defined by state law" in bankruptcy

13

cases "[u]nless some federal interest requires a different result").  The events that led to the filing of this adversary proceeding occurred in both Illinois and Michigan.  As a result, this court faces the preliminary question of which state's law should apply to the Trustee's causes of action.

To begin, the court notes that a choice of law analysis need only occur when there is "an actual conflict between the substantive law of the interested jurisdictions."  *In re Appalachian Fuels, LLC*, 493 B.R. 1, 18 (B.A.P. 6th Cir. 2013).  In this proceeding, the potentially applicable Illinois and Michigan fraudulent transfer laws differ materially, both in the substantive intent standards they employ and in their statutes of limitations.  Because of these differences, this court believes a choice of law analysis is an appropriate and essential first step with regard to the fraudulent transfer claim alleged by the Trustee in this proceeding.  By contrast, the parties have generally agreed that while Illinois and Michigan formulate their tests for unjust enrichment slightly differently, the substantive differences are unlikely to be material.  *See* Tr. at 45-46.  The court concurs with the parties' assessment of this issue and therefore, has not engaged in a comprehensive choice of law analysis on the unjust enrichment claims.[7]  Instead, to the extent the Trustee

---

[7]     When determining what state's law applies to quasi-contractual claims such as those for unjust enrichment, both Michigan and federal choice of law rules utilize the standard set forth in the *Restatement (Second) of Conflicts of Laws.  See, e.g., Johnson v. Ventra Group, Inc.*, 191 F.3d 732 (6th Cir. 1999) (applying Michigan choice of law rules and explaining, in dicta, that Michigan has applied the *Restatement*'s "most significant relationship" test).  In actions for restitution, the *Restatement* encourages courts to consider the following factors when determining which state has the most significant relationship to the transaction at issue:

> (a) the place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship,
> (b) the place where the benefit or enrichment was received,
> (c) the place where the act conferring the benefit or enrichment was done,
> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

has asserted unjust enrichment or constructive trust claims based on the prior Illinois state court order or as assignee of Jorie, an Illinois entity, the court has applied Illinois law.  To the extent the Trustee has asserted claims allegedly held by the Debtor on behalf of the bankruptcy estate, the court has applied Michigan substantive law.

With regard to the fraudulent transfer claim, the next step in the analysis is to determine whether state or federal law supplies the choice of law rules in this bankruptcy case.  There is currently a split of authority on that issue.  In a case decided well before the enactment of the current Bankruptcy Code, the Sixth Circuit Court of Appeals took the position that bankruptcy courts should apply the choice of law rules of the state in which they sit.  *United Constr. Co. v. Milam*, 124 F.2d 670, 671 (6th Cir. 1942) (citing *Klaxton Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020 (1941) which established the general rule that federal courts sitting in diversity must apply the choice of law rules of the forum state).  More recent Sixth Circuit cases have acknowledged the split of authority that has developed since *Milam* was decided but have declined to revisit the issue.[8]  *See Sutherland v. DCC Litigation Facility, Inc. (In re Dow Corning Corp.)*, 778

---

(e) the place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment.

*Restatement (Second) of Conflicts of Laws* § 221 (1971).  If this court was required to decide the issue, the court believes these factors would weigh in favor of applying Illinois law to the unjust enrichment and constructive trust claims asserted by the Trustee as Jorie's assignee and Michigan law to the claims asserted on behalf of the Debtor.

[8]    Other courts within the Sixth Circuit have considered the continued applicability of *Milam* but have reached differing results.  *Compare Limor v. Weinstein & Sutton (In re SMEC, Inc.)*, 160 B.R. 86, 89-91 (M.D. Tenn. 1993) (opining that the Supreme Court's subsequent decision in *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 67 S. Ct. 237 (1946) and policy considerations would likely cause the Sixth Circuit to revisit *Milam* and instead endorse the "most significant contacts test" when considering choice of law questions in bankruptcy cases) *with In*

15

F.3d 545, 551 n.1 (6th Cir. 2015) (noting the "longstanding circuit split" on the "broader question" of whether *Klaxton* and *Milam* continue to apply to "*all* state law disputes arising under the bankruptcy power," but declining to address that question); *State Bank of Florence v. Miller (In re Miller)*, 513 F. App'x 566, 572 (6th Cir. 2013) (unpublished opinion).

Like the Sixth Circuit, this court is not required to decide whether state or federal choice of law rules are to be applied in this proceeding because the result here would be the same under either set of standards.  On the Trustee's fraudulent transfer claim, both Michigan and federal choice of law rules direct this court to apply the law of the state where the property that was subject to the alleged avoidable transfer was located. *Timber-Lee Evangelical Free Church Christian Ctr. v. Baraga County Road Commission*, 145 F.3d 1333, 1998 WL 228044, *1 (6th Cir. Apr. 29, 1998) (unpublished table opinion) ("Michigan courts follow the principle of *lex loci rei sitae* and apply the law of the state in which the property in dispute is situated.") (citing *U.S. Truck Co. v. Pennsylvania Surety Corp.*, 243 N.W. 311, 312 (Mich. 1932)) (additional citation omitted); *see also Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 162, 67 S. Ct. 237 (1946) (federal choice of law rules provide that the law of the state with the "most significant contacts" should apply); *Restatement (Second) of Conflict of Laws* § 6 (setting forth general factors that may be considered when determining which state has the "most significant contacts") & § 223 (identifying specific considerations that apply to transactions involving the validity and effect of conveyances of land and stating that such questions are typically governed

---

*re Wallace's Bookstores, Inc.*, 317 B.R. 709, 712 (Bankr. E.D. Ky. 2004) (holding that *Milam* is to be followed "unless and until" it is specifically overruled by the Sixth Circuit ).

16

by the law of the state where the property is located).  In this case, that state is clearly Illinois.  The parties have not disputed that Illinois law governs the substantive aspects of the Trustee's fraudulent transfer claim.

C. *Fraudulent Transfer Claim*.

The fraudulent transfer claim in this proceeding is brought pursuant to § 544(b) of the Bankruptcy Code, which gives the Trustee the right to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law" by a creditor holding an allowable unsecured claim.  11 U.S.C. § 544(b)(1).  "In order for a trustee to have standing to avoid a transfer under § 544(b), the trustee must first establish that at the time of the transaction there was, in fact, a creditor in existence who was holding an unsecured claim that is allowable under 11 U.S.C. § 502."  *Solomon v. Fellmy (In re Felsner)*, 289 F. App'x 879, 883 (6th Cir. 2008).  The unsecured creditor on which a trustee bases his or her standing is often referred to as the "triggering" or "golden" creditor.  *See Meoli v. Cooper (In re Allen)*, 521 B.R. 613, 624 (Bankr. W.D. Mich. 2014).  The overall effect of § 544(b) is to permit the trustee to "stand in the shoes" of the triggering unsecured creditor and "assert causes of action under state fraudulent conveyance laws for the benefit of all creditors."  *Lyon v. Eiseman (In re Forbes)*, 372 B.R. 321, 330 (B.A.P. 6th Cir. 2007).

It is undisputed that the transfer the Trustee seeks to avoid is the initial purchase of the Illinois Property by the Debtor and Mrs. Zagotta as tenants by the entirety.  That transaction occurred in October 2015.  The Trustee's briefing clearly identifies Jorie, an Illinois limited partnership, as the triggering creditor.  As noted above, the parties agree

17

and the court has determined that Illinois fraudulent conveyance law is the applicable substantive law on which the Trustee relies in seeking to avoid this transfer.

Illinois has adopted the Uniform Fraudulent Transfer Act (the "UFTA"), which contemplates avoidance of transfers to the extent they were either actually or constructively fraudulent as to creditors.[9]  *See* 740 Ill. Comp. Stat. 160/5.  Illinois law is somewhat unique, however, in that it provides special protection to property held as tenants by the entirety via a provision in the Illinois Code of Civil Procedure.  That provision states that property held in tenancy by the entirety is not subject to being sold to satisfy a judgment held against only one of the tenants, "except if the property was transferred into tenancy by the entirety with the sole intent to avoid the payment of debts existing at the time of the transfer beyond the transferor's ability to pay those debts as

---

[9]      The relevant portion of Section 5 of the Illinois UFTA provides that:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 Ill. Comp. Stat. 160/5(a).

they become due." *See* 735 Ill. Comp. Stat. 5/12-112 (referred to herein as the "tenancy by the entirety statute" or "§ 12-112").

The Illinois Supreme Court considered the interplay between the tenancy by the entirety statute and the UFTA in *Premier Property Management, Inc. v. Chavez*, 728 N.E.2d 476 (Ill. 2000). The case involved a debtor who transferred his residence, which he had previously owned solely in his name, to himself and his wife and tenants by the entirety during the pendency of litigation against him. The judgment creditor sought to avoid the conveyance and the court was required to determine whether the action was governed by the UFTA's actual intent standard or the "sole intent" standard set forth in the tenancy by the entirety statute. The court held that "the tenancy by the entirety provision expressly includes its own standard to be used when a creditor challenges a transfer to that estate." *Id*. at 481. In so holding, the court noted that this sole intent standard was "substantially different" than the actual intent standard of the UFTA in that it provided "greater protection from creditors for transfers of property to tenancy by the entirety." *Id*. at 482. More specifically, the court explained:

> Under the sole intent standard, if property is transferred to tenancy by the entirety to place it beyond the reach of the creditors of one spouse *and* to accomplish some other legitimate purpose, the transfer is not avoidable. Such a transfer, however, would be avoidable under the actual intent standard, which only requires any actual intent to defraud a creditor. The General Assembly, by adopting the sole intent standard, has made it clear that it intends to provide spouses holding homestead property in tenancy by the entirety with greater protection from the creditors of one spouse than that provided by the Fraudulent Transfer Act. Accordingly, the Fraudulent Transfer Act's actual intent standard is not to be used to avoid transfers of property made to tenancy by the entirety.

*Id*. (citing *Harris Bank St. Charles v. Weber,* 700 N.E.2d 722 (Ill. App. Ct. 1998); *Brown v. Stacy (In re Stacy),* 223 B.R. 132, 136 (N.D. Ill. 1998)).

19

Although the amended complaint in this proceeding cites the actual fraud provision of the Illinois UFTA, 740 Ill. Comp. Stat. 160/5(a)(1), as the legal basis for avoiding the transfer, for purposes of the present summary judgment motions, the parties generally agree that § 12-112 provides the legal standard that governs the Trustee's fraudulent transfer claim.  The Defendants argue, however, that the Trustee has failed to satisfy this sole intent standard, as a matter of law, in this proceeding.  They also asset that the Trustee's cause of action is barred by the applicable statute of limitations.

1.   *Ability to Repay and Sole Intent.*

To avoid the challenged transfer under the Illinois tenancy by the entirety statute, the Trustee must establish two elements:  (1) that, at the time of the transfer, the Debtor was unable to pay existing debts as they became due, and (2) that the Debtor transferred the property at issue with the sole intent of avoiding payment of those debts.  *Harris Bank, N.A. v. Werner (In re Werner)*, 410 B.R. 797, 806 (Bankr. N.D. Ill. 2009); *Brown v. Stacy (In re Stacy)*, 227 B.R. 272, 278 (Bankr. N.D. Ill. 1998).   Illinois courts applying this standard have noted that the burden it imposes on the party seeking to avoid a transfer of property to the entirety is both "difficult" and "substantial."  *In re Stacy*, 227 B.R. at 278.

The parties have not devoted much attention to the first element of whether the Debtor was able to pay existing debts as they became due when he and Mrs. Zagotta originally purchased the Illinois Property in October 2015.   The Trustee's amended complaint does not include any factual allegations on this point, in part because it was primarily pled as an actual fraudulent transfer cause of action under the UFTA.   On summary judgment, the Trustee has correctly argued that Illinois law does not require that a debt be formally reduced to judgment to be considered an "existing debt" under the

20

tenancy by the entirety statute. *In re Stacy*, 227 B.R. at 277 (holding that the phrase "existing debt" in § 12-112 "is not limited to only those debts which have been reduced to judgment in favor of one or more creditors"). However, even assuming that the Debtor's liability to Jorie for unjust enrichment accrued when the wrong was committed and therefore constituted an "existing debt" in October 2015, there is no direct evidence in the record regarding the Debtor's ability to repay that debt. The court could potentially surmise from the general factual context of the Defendants' financial situation in 2015, and from the undisputed fact that the Defendants could not have purchased the Illinois Property for cash without the proceeds of the Jorie investment, that the transfer left the Debtor without sufficient assets to repay Jorie at the time the transfer was made. But it is not the court's role to guess at the relevant facts; instead, it is the Trustee's burden to establish that the purchase of the Illinois Property rendered the Debtor unable to pay existing debts as they became due. Without putting a finer point on if and when that occurred, and alleging specific facts about the Debtor's financial situation at that time, the Trustee has not met his burden on the current record. *See Celotex Corp.*, 477 U.S. at 323 (summary judgment is appropriate when non-moving party fails to make a sufficient showing on an essential element of his case and on which he bears the burden of proof); *Matsushita Electric*, 475 U.S. at 586-87 (party opposing summary judgment must do more than show there is some "metaphysical doubt" as to the material facts).

Even if the first element has been satisfied, the Trustee must also show that the Debtor used the proceeds of Jorie's investment in CCDM to purchase the Illinois Property with the sole intent of defrauding his creditors. The Defendants argue that the Trustee has failed to do so. In support of that argument, the Defendants point to the Debtor's

21

deposition testimony wherein he offered several explanations for the purchase of the Illinois Property. Specifically, the Debtor explained that the Defendants' family was growing at the time, that their high-rise apartment was not suitable for family living, and that he believed they could afford a new place because of the money he made in the CCDM transaction. The Trustee acknowledges this testimony but argues that the Debtor's intent is a factual issue that should be determined at trial. The court agrees that intent is a factual issue which should typically be determined at trial, after the court has an opportunity to assess the credibility of the Debtor's explanations. *In re Stacy*, 227 B.R. at 276 (under § 12-112, "[t]he question of a debtor's intent at the time of the transfer is for the trier of fact").

However, in this proceeding, there are over-arching factual considerations that support the Debtor's version of events and stand in the way of a rational trier of fact finding for the Trustee on the sole intent issue, even when all inferences are drawn in his favor. The first is the Illinois state court's finding that none of the parties to the transaction between Jorie and CCDM, other than Johnson, suspected that the IBM contract was fraudulent at the time. This means that even if the Debtor's contingent debt to Jorie technically accrued at the time of the initial investment, the Debtor could not have acted with the subjective intent to insulate his assets from repayment of that debt because he would have had no reason to suspect that the debt even existed in October 2015. The Debtor's other explanations for the purchase of the Illinois Property become much more credible when viewed in this context. The Debtor's testimony is also supported by other objective facts in the record. For instance, his deposition testimony that the Defendants purchased the Illinois Property because their family was growing is bolstered by the

22

objective fact that the Defendants did have additional children around the time the property was purchased.   Under the circumstances, the court could not find that the Debtor purchased the Illinois Property with the sole intent of avoiding his debt to Jorie.

2. *Statute of Limitations*.

The Defendants' argument that the Trustee's fraudulent transfer claim is barred by the applicable statute of limitations rests on the difference between the four year statute of limitations that applies under the Illinois UFTA and the six year statute that applies under Michigan law.   *Compare* 740 Ill. Comp. Stat. 160/10(a) & (b) (cause of action for actual or constructively fraudulent transfers generally must be brought within four years of the transfer) *with* Mich. Comp. Laws § 566.39(a); § 600.5813 (six year statute of limitations applies to fraudulent transfer claims).   Because the transfer at issue in this proceeding occurred in October 2015 – approximately five years before the filing of the Debtor's bankruptcy petition – the question of which state's limitations period applies is potentially dispositive of the fraudulent transfer causes of action asserted here.

The Trustee argues that although both Michigan and federal choice of law rules mandate application of Illinois law on the substantive issues presented, Michigan law should apply to the procedural aspects of the Trustee's fraudulent transfer claim, including the applicable statute of limitations.[10]   *See Johnson v. Ventra Group, Inc*., 191 F.3d 732,

---

[10]      The Defendants disagree with the Trustee's characterization of the statute of limitations as a procedural mechanism, arguing instead that it is a substantive provision of the Illinois UFTA because it places limitations on the underlying substantive right of avoidance and does not merely limit the available remedy.   As such, the Defendants assert that the four year limitation under the Illinois UFTA should apply, regardless of what Michigan law provides.   *See Whitfield v. City of Knoxville*, 756 F.2d 455, 461 (6th Cir. 1985) (explaining that while a trial court may generally "ignore another jurisdiction's statute of limitations as being a procedural rule affecting only the remedy," an exception exists, and the foreign statute must be applied "if the statute of limitations eliminates the underlying substantive right as well as the remedy") (internal citations omitted).

746 (6th Cir. 1999) ("Under Michigan's common law choice of law rule, statutes of limitation are considered procedural and are governed by the law of the forum.") (citing *Isley v. Capuchin Province*, 878 F. Supp. 1021, 1025 (E.D. Mich. 1995)). Michigan has enacted a borrowing statute, Mich. Comp. Laws § 600.5861, which applies when a cause of action accrues in another jurisdiction but is brought in a Michigan court. The statute states, in pertinent part:

> An action based upon a cause of action accruing without this state shall not be commenced after the expiration of the statute of limitations of either this state or the place without this state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of this state the statute of limitations of this state shall apply . . . .

Mich. Comp. Laws § 600.5861. The borrowing statute has been described as "a legislative exception from the general rule that the forum always applies its statute of limitation." *Combs v. Int'l Insurance Co.*, 354 F.3d 568, 578 (6th Cir. 2004). It "basically provides that whichever statute of limitations time-bars a plaintiff's claim [either the statute of the state where the cause of action accrued or Michigan's statute] should apply." *Hall v. General Motors Corp.*, 582 N.W.2d 866, 871 (Mich. Ct. App. 1998).

---

There is a split of authority among the Illinois courts as to whether the four year period established under the Illinois UFTA is a substantive statute of repose or a procedural statute of limitations. *Compare Harris Bank v. Werner (In re Werner)*, 386 B.R. 684, 698-99 (Bankr. N.D. Ill. 2008) (four year statute of limitations is not a statute of repose) *with Reinbold v. Kohansieh (In re Sandburg Mall Realty Management, LLC)*, 563 B.R. 875, 898 (Bankr. C.D. Ill. 2017) (predicting that the Illinois Supreme Court would consider the UFTA limitation period a statute of repose). This court need not answer that difficult question, however, because the Michigan borrowing statute greatly reduces the importance of any such distinction. *See Hall v. General Motors Corp.*, 582 N.W.2d 866, 871 (Mich. Ct. App. 1998) (acknowledging the issue of whether Michigan's borrowing statute applies to substantive statutes of repose as well as procedural statutes of limitation but declining to decide the question because, either way, the foreign state's limitations period controlled). That is, even if the Trustee is correct that Michigan law governs, the borrowing statute directs that the Trustee's claim will be barred by the shorter Illinois limitation period unless he establishes that the statutory exception for Michigan residents applies.

Even if the court accepts the Trustee's argument that the Michigan borrowing statute governs the Trustee's fraudulent transfer claim, it still renders the claim untimely because the Illinois four year statute of limitations, as the shorter of the two options, would bar the claim.  In an effort to escape this conclusion, the Trustee argues that the statutory exception for causes of action accruing in favor of Michigan residents applies.  As a Michigan resident, the Trustee asserts that he should be able to avail himself of this exception.

The Trustee's arguments on this point are not persuasive.  Under both Illinois and Michigan law, fraudulent transfer actions are generally understood to accrue when the challenged transfer is made.[11]  *Salisbury v. Majesky*, 817 N.E.2d 1219, 1222 (Ill. App. Ct. 2004) ("the clear and unambiguous wording of the [UFTA] demonstrates [that] the four-year limitation period begins to run on the date the challenged transfer was made") (quoting *Levy v. Markal Sales Corp.*, 724 N.E.2d 1008, 1010 (Ill. App. Ct. 2000)); *Gold v. Winget (In re NM Holdings Co.)*, 407 B.R. 232, 264 (Bankr. E.D. Mich. 2009) (Under Michigan fraudulent transfer law, "the making of the fraudulent transfer is the 'wrong' upon which the claim is based, so the date of the transfer is the date the fraudulent transfer claim 'accrues.'") (citing *Americorp Fin. Group, Inc. v. Powerhouse Licensing, LLC*, No. 271189, 2007 WL 189374, *3-4 (Mich. Ct. App. Jan. 25, 2007) (unpublished opinion)).  Here, the Trustee acknowledges that the fraudulent transfer claim asserted in this proceeding accrued in Illinois.  Were it otherwise, the borrowing statute, which only

---

[11]   *But cf. GEA Group AG v. Flex-N-Gate Corp.*, 740 F.3d 411, 417 (7th Cir. 2014) (suggesting, in dicta, that the Illinois UFTA's statute of limitations may not begin to run until after the creditor obtains a judgment against the debtor).  This was not argued by the Trustee, nor does the court find the *GEA Group* dicta be a controlling statement of the law, particularly in light of the Illinois Appellate Court decisions that directly and persuasively hold to the contrary.

governs causes of action accruing outside of Michigan, would not apply to the claim at all.  Notwithstanding this admission, the Trustee takes the position that the claim should now be viewed as having accrued in favor of the Trustee as a Michigan resident.  This argument is contradictory and ultimately untenable.  To the extent the fraudulent transfer claim accrued when the transfer was made in October of 2015, it could have only accrued in favor of Jorie, an Illinois entity, or Koplin, an Illinois resident.  After the filing of the Debtor's bankruptcy case, approximately five years later, that fraudulent transfer cause of action was assigned to the Trustee.  However, there is no plausible basis for concluding that the assignment changed the identity of the party for whose benefit the claim accrued.

Independent of the assignment, the Trustee also became empowered to assert that claim on behalf of the bankruptcy estate by virtue of § 544(b).  Again, this did not occur until the Debtor's bankruptcy case was filed, five years after the fraudulent transfer claim accrued in Illinois.  In bringing the claim under § 544(b), the Trustee relied on Jorie as the "triggering creditor."  When a trustee steps into the shoes of an unsecured creditor for purposes of asserting state law fraudulent transfer claims, the trustee's ability to bring the claims is limited by any defenses, including the applicable statute of limitations, that could be asserted against the creditor.  *Lyon v. Eiseman (In re Forbes)*, 372 B.R. 321, 335 (B.A.P. 6th Cir. 2007) (citations omitted); *Belfance v. Bushey (In re Bushey)*, 210 B.R. 95, 100 (B.A.P. 6th Cir. 1997) (when asserting claims under § 544(b), the trustee is "subject to any defenses that could be asserted against the creditor").  Applying this principle also belies the Trustee's argument that the fraudulent transfer claim accrued in Illinois in 2015, but then somehow accrued again in his favor upon the filing of the case for purposes of the borrowing statute.  Instead, the most natural reading of the borrowing

statute, the Illinois UFTA, and § 544(b) leads to the conclusion that the fraudulent transfer claim accrued in Illinois, in favor of Illinois entities Jorie and Koplin, well prior to the Trustee's involvement.  As a result, the fraudulent transfer claim asserted by the Trustee is not saved by the borrowing statute's exception for claims accruing in favor of Michigan residents and is time barred by the four-year statute of limitations under the Illinois UFTA.

In his supplemental brief, the Trustee raised several additional arguments in his attempt to take advantage of the Michigan resident provision of the borrowing statute. Again, although the arguments are creative, they are not ultimately persuasive.  First, the Trustee compares the language of other state borrowing statutes which address when the cause of action "originally accrued" to the Michigan statute which does not include the word "originally."  *See, e.g.,* Del. Code Ann. tit. 10, § 8121; N.C. Gen. Stat. Ann. § 1-21. This is not a persuasive distinction because the term "accrued" refers to a set point in time on its own, even without further qualification.  *Black's Law Dictionary* (11th ed. 2019) (accrue means "[t]o come into existence as an enforceable claim or right; to arise . . . ."). The Trustee also suggests that, despite the language of the statute, Michigan caselaw has applied the borrowing statute more broadly to "plaintiffs" who are Michigan residents. However, the case cited by the Trustee in support of this assertion, *Bechtol v. Mayes*, 499 N.W.2d 439, 440 (Mich. Ct. App. 1993), involved a claim brought in Michigan by a resident of Hawaii.  Although the Court of Appeals referred shorthandedly to the "plaintiff," the case itself did not address a situation where the cause of action had arguably accrued in favor of a different party than the plaintiff who was bringing the claim.  In fact, the case did not require application of the resident exception of the borrowing statute at all.

27

Accordingly, *Bechtol* does not offer any guidance on the question before this court and does not provide a basis for deviating from the plain language of the borrowing statute.

In a final attempt to overcome the statute of limitations problems with his fraudulent transfer claim, the Trustee argues, for the first time in his supplemental brief, that even if Illinois law applies to the claim, the applicable statute of limitations under Illinois law should be five years under the general statute that applies to civil actions to recover property, 735 Ill. Comp. Stat. 5/13-205, rather than four years under the Illinois UFTA.  In support of this assertion, the Trustee cites *Harris Bank St. Charles v. Weber*, 700 N.E.2d 722, 729 (Ill. App. Ct. 1998).  This case predates the Illinois Supreme Court's decision in *Premier Property* but reached the same conclusion that the "sole intent" standard set forth in § 12-112 is the standard that applies when the transfer of property to tenancy by the entirety is challenged as fraudulent under Illinois law.  Although the Trustee is correct that the appellate court in *Harris Bank* distinguished prior case law by summarily stating that "the legislature did not intend for the Uniform Fraudulent Transfer Act to apply to transfers into tenancy by the entirety," the Supreme Court's subsequent decision in *Premier Property* did not state the proposition so broadly.  *See Harris Bank*, 700 N.E.2d at 728-29.  Instead, *Premier Property* held that the UFTA's "actual intent *standard* is not to be used to avoid transfers of property made to tenancy by the entirety."  *Premier Property*, 728 N.E.2d at 482 (emphasis added).  The *Premier Property* decision did not address what statute of limitations applied to such claims, and it does not appear that the Illinois Supreme Court has considered that question in any subsequent decisions.[12]  Indeed, the

---

[12]    Since the Supreme Court's decision in *Premier Property*, other Illinois courts have summarily referred to the Illinois tenancy by the entirety statute as "providing authority" to avoid transfers and have held that such claims may be pled under the tenancy by the entirety statute

only post-*Premier Property* case this court was able to locate that has directly addressed the applicable statute of limitations for claims challenging transfers of property to the entirety as potentially fraudulent held that the UFTA's four year statute of limitations applied to such claims.  *Harris Bank, N.A. v. Werner (In re Werner)*, 386 B.R. 684, 691 (Bankr. N.D. Ill. 2008) (discussing a claim to avoid transfer of a debtor's residence to tenancy by the entirety and holding that the "statute of limitations for initiating a fraudulent transfer action" under Illinois law "is found at 740 ILCS 160/10").  In the absence of any authority from the Illinois Supreme Court suggesting otherwise, this court will follow *Werner* and holds that the UFTA's statute of limitations applies to the Trustee's fraudulent transfer claim in this adversary proceeding.

Because the Trustee's fraudulent transfer claim was brought outside of the applicable statute of limitations, and because the Trustee has not set forth evidence from which a rational trier of fact could conclude that the Debtor was unable to pay his debts at the time of the transfer or that he made the transfer with the sole intent of avoiding repayment of those debts, the claim is not sustainable as a matter of law.  The

---

rather than the UFTA.  *See, e.g., Olsen v. Paulsen (In re Paulsen)*, 623 B.R. 747, 751 (Bankr. N.D. Ill. 2020); *Int'l Lease Finance Corp. v. Tunca*, 2011 WL 2672354, *2 (N.D. Ill. July 8, 2011) (unpublished opinion) (denying motion to dismiss complaint brought solely under the tenancy by the entirety statute because, under Illinois law, a creditor may "challenge the propriety of a transfer of property to tenancy by the entirety under 735 ILCS 5/12-112 of the Illinois Code of Civil Procedure") (citing *Divane v. Krull Elec. Co*., 2002 WL 31844987, *2 (N.D. Ill. Dec. 18, 2002) (unpublished opinion) ("The tenancy by the entirety provision of the Illinois Code of Civil Procedure provides the intent standard that governs a challenge by a creditor to the propriety of a transfer of property to tenancy by the entirety.")).  This court does not read these cases, most of which address pleading standards and all of which cite back to *Premier Property*, as dispositive on the statute of limitations issue currently before the court.

Defendants' motion for summary judgment on the fraudulent transfer claim shall be granted.

      D. *Unjust Enrichment and Constructive Trust Claims*.

As an alternative to his strong-arm fraudulent transfer claim, the Trustee's complaint in this adversary proceeding also seeks to impose a constructive trust on the Michigan Property. Both Illinois and Michigan law recognize constructive trusts as an equitable remedy that may be imposed when "a defendant is unjustly enriched by the acquisition of title to identifiable property at the expense of the claimant or in violation of the claimant's rights." *Restatement (Third) of Restitution & Unjust Enrichment* § 55(1) (2011); *see Kammer Asphalt Paving Co. v. East China Township Schools*, 504 N.W.2d 635, 641 (Mich. 1993); *Charles Hester Enterprises, Inc. v. Illinois Founders Ins. Co.*, 499 N.E.2d 1319, 1326 (Ill. 1986). Here, although the Illinois state court previously determined that the Debtor was unjustly enriched by Jorie's original investment in CCDM, it is undisputed that Mrs. Zagotta and her Trust were not involved in that underlying transaction and were not parties to the litigation that resulted in the prior determination. Notwithstanding those facts, the Trustee's constructive trust claims urge this court to take a broad view of the equities of the transfers at issue and impose a constructive trust on the Michigan Property in this proceeding. The Trustee seeks this equitable relief in two capacities. First, under the base case settlement agreement, the Trustee stands in Jorie's shoes, as assignee of the rights Jorie previously asserted or held under Illinois law and pursuant to the state court orders determining Jorie's claim against the Debtor. In this role, the Trustee generally seeks imposition of a constructive trust on the Michigan Property based on the interests Mrs. Zagotta and Trust acquired downstream of the initial

30

investment transaction.  Second, by virtue of the bankruptcy filing, the Trustee stands in Debtor's shoes.  In this capacity, the Trustee seeks to impose a constructive trust on the Michigan Property for the benefit of the bankruptcy estate based on the assertion that Mrs. Zagotta and the Trust were unjustly enriched at the Debtor's expense when they acquired their interests in the Illinois and Michigan Property without making a direct financial contribution to those acquisitions.  The court will address each of these arguments in turn.

1.  *Trustee in Jorie's Shoes.*

The Trustee's first arguments for imposition of a constructive trust on the Michigan Property are brought in his capacity as the assignee of claims previously held by Jorie. Pursuant to the settlement agreement, Jorie assigned all of its "right, title and interest in any constructive trust" on the Michigan Property or any other property owned by the Debtor, Mrs. Zagotta, or her Trust to the bankruptcy estate.  This assignment renders Jorie's right, title, or interest in any constructive trust on the Michigan Property part of the bankruptcy estate under § 541(a)(7) and purports to vest the Trustee "with the rights and powers of Jorie, LP to pursue an action [f]or constructive trust and/or the enforcement of same."[13]  Accordingly, this court must analyze the rights the Trustee succeeded to under the prior state court orders and must also consider the extent to which the Trustee may pursue additional unjust enrichment and constructive trust claims against Mrs. Zagotta and her Trust based on Jorie's state law rights.  Because the prior orders were entered by an Illinois state court, this court will look to Illinois law to determine their effect in this adversary proceeding.  *See Migra v. Warren City School District Bd. of Educ.*, 465 U.S.

---

[13]    *See* Order Approving Settlement Agreement, Base Case Dkt. No. 71.

31

75, 81, 104 S. Ct. 892 (1984) ("a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered").

      a. Effect and Enforcement of Existing State Court Orders.

The prepetition litigation in the Illinois state court resulted in a determination that Jorie's investment in CCDM, which occurred in large part due to misrepresentations about the non-existent IBM contract, resulted in the Debtor being unjustly enriched at Jorie's expense. The Illinois court entered summary judgment in Jorie's favor on that claim. As one remedy for that unjust enrichment, the Illinois court entered a $2,625,000 money judgment against the Debtor. *See HPI Health Care Servs., Inc. v. Mt. Vernon Hospital, Inc.*, 545 N.E.2d 672, 678-79 (Ill. 1989) (explaining that, under Illinois law, the "doctrine of unjust enrichment underlies a number of legal and equitable actions and remedies" including legal actions for restitution and the equitable remedy of constructive trust). A few days later, the state court entered an order imposing a constructive trust on the Michigan Property for Jorie's benefit as an additional equitable remedy for the unjust enrichment that occurred. *See generally Charles Hester Enterprises*, 499 N.E.2d at 1326 ("A constructive trust is an equitable remedy that may be imposed to redress unjust enrichment caused by a party's wrongful conduct."). Unfortunately for Jorie (and now for the Trustee, as Jorie's assignee), the legal and practical effect of that order is limited for several reasons.

Under Illinois law, the consequence of an order imposing a constructive trust is to "compel one who unfairly holds property to convey it to another to whom it justly belongs." *Lecrone v. Leckrone*, 580 N.E.2d 1233, 1238 (Ill. App. Ct. 1991). In this sense, a

32

constructive trust is not technically a trust at all and does not act directly on the title or the property itself.  *See Berger, Shapiro & Davis, P.A. v. Haeling (In re Foos)*, 183 B.R. 149, 158-59 (Bankr. N.D. Ill. 1995) (explaining that constructive trusts are equitable remedies that have little in common with express trusts); *see also Blachy v. Butcher*, 221 F.3d 896, 905 (6th Cir. 2000) (noting that a constructive trust under Michigan law is not "strictly . . . a trust at all, but merely a remedy" for "certain fraudulent breaches of trust").  Instead, a constructive trust acts "upon the person of the defendant" and directs him to reconvey legal title to the property to the equitable owner on appropriate conditions. Dan B. Dobbs & Caprice L. Roberts, *Law of Remedies: Damages, Equity, Restitution* § 4.3(1) (3d ed. 2018); *Restatement (Third) of Restitution & Unjust Enrichment* § 55 cmt. b; *see also CGC Holding Co. v. Hutchens*, 974 F.3d 1201, 1216 (10th Cir. 2020) (holding that, under Colorado law, a constructive trust is an *in personam* order, which means that "the constructive trust does not bind the real estate itself" but rather "the owners of the real estate").  Here, it is clear that the Debtor did not hold legal title to the Michigan Property at the time the order imposing the constructive trust was entered.  The sole effect of the order was to obligate the Debtor to surrender title of the Michigan Property to Jorie.  This is a feat he could not – and still cannot – accomplish because he has never held legal title to the property.[14]

---

[14]     Although the parties have acknowledged that the Debtor retains certain property rights, including the right to possession, in the Michigan Property as a beneficiary under the Trust, the Trustee has not argued that the constructive trust imposed by the Illinois court should attach to those limited rights and has not suggested any method for valuing those rights.  Given the nature of a constructive trust as a means of vindicating equitable ownership of a particular asset or an identifiable portion thereof from the holder of legal title, the court believes it would be nearly impossible for the Trustee to prevail on a claim that the constructive trust should attach to the Debtor's limited interests in the Michigan Property, even if that argument had been raised.

On the opposite side of this same coin, it is also clear that neither the Trust, as the actual owner of the Michigan Property, nor Mrs. Zagotta, as Trustee and an individual with an entireties interest in the Illinois Property, were parties to the state court litigation. It is axiomatic that "one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process."[15] *Hansberry v. Lee*, 311 U.S. 32, 40-41, 61 S. Ct. 115 (1940). A judgment that does not meet this requirement is not entitled to full faith and credit and "a judicial action enforcing it against the person or property of the absent party" does not afford the due process required by the Fifth and Fourteenth Amendments. *Id*. In accordance with these principles, due process required that Mrs. Zagotta and the Trust be afforded an opportunity to contest the allegations raised by Jorie in the state court litigation, and to raise any defenses they may have had, before a constructive trust was imposed on property they owned. That did not occur. As a result, the state court order was not effective to bind either Mrs. Zagotta or her Trust. To the extent the Trustee, as the assignee of Jorie, seeks turnover of the Michigan Property based solely on enforcement of the prior order, the Trustee is not entitled to that relief.

---

[15]     There are limited exceptions to this general rule which recognize that a non-party may be bound "where he is represented by a party or where his interests are derivative from those of a person who was a party." *Restatement (Second) of Judgments* § 34 reporter's note to cmt. a (1982). Here, the Trustee has asserted that Mrs. Zagotta and the Trust were in "privity" with the Debtor but has raised those issues in the context of his argument that the prior order is entitled to issue preclusive effect in this proceeding. The court finds those arguments unavailing, for the reasons discussed below, and would similarly conclude that Mrs. Zagotta and the Trust were not in privity with the Debtor for claim preclusion purposes.

34

b.  Claims for Imposition of "New" Constructive Trust in this Proceeding.

Apparently recognizing the limited reach of the prior state court order as against Mrs. Zagotta and her Trust, the Trustee's motion for summary judgment asks this court to impose a "new" constructive trust on the Michigan Property, based in part on the prior state court determinations.  Specifically, the Trustee asserts that the prior state court findings are entitled to preclusive effect in this proceeding and that those findings establish that the funds used to purchase the Michigan Property were "traceable to the proceeds of fraud, or at least unjust enrichment."[16]

Generally speaking, imposition of a constructive trust is only an appropriate remedy when the transaction in which the defendant acquires the specific property at issue is the one that gives rise to the liability for unjust enrichment.[17]  *See, e.g., Restatement (Third) of Restitution & Unjust Enrichment* § 55 cmt. f.  For this reason, a direct constructive trust claim against Mrs. Zagotta or her Trust is unlikely to be sustainable because neither entity acquired their property interests directly from Jorie or had any involvement in the original unjust enrichment.  However, like most states, Illinois follows the "well-established principle" that property which is subject to a constructive trust (i.e., the trust *res*) "may be followed by the beneficiary into any and all the forms it may

---

[16]     *See* Trustee's Brief in Support of Motion for Summary Judgment, AP Dkt. No. 46, at p. 14.

[17]     Illinois recognizes certain limited exceptions to this general rule when, for instance, the third party had knowledge of or participated in the original unjust enrichment.  *See Goodman v. Phoenix Container, Inc. (In re DeMert & Dougherty, Inc.)*, 271 B.R. 821, 849-50 (Bankr. N.D. Ill. 2001) (noting that "the transaction assailed in a constructive trust is usually one between the parties directly" but that this is not a "prerequisite;" instead, a third party who induces a breach of loyalty, participates in the breach, or knowingly accepts the benefit from such a breach may be "directly liable to the aggrieved party").  There is no evidence suggesting any such exception should apply in this case.

35

assume" so long as it is "capable of identification."   *Sadacca v. Monhart*, 470 N.E.2d 589, 593 (Ill. App. Ct. 1984); *see also Restatement (Third) of Restitution & Unjust Enrichment* § 55(1) (permitting constructive trust on property "and its traceable product").   In accordance with this rule,

> [w]hen a person's property has been wrongfully appropriated and converted into a different form, "equity impresses a constructive trust upon the new form or species of property, not only while it is in the hands of the original wrong-doer but as long as it can be followed and identified in whosesoever hands it may come, except those of a bona fide purchaser for value.

*Sadacca*, 470 N.E.2d at 593-94 (quoting 4 Pomeroy, *Equity Jurisprudence* § 105, at 113 (5th ed. 1941)).  When traceable proceeds of a prior unjust enrichment are transferred to a third party who is not a bona fide purchaser for value, courts may deem it appropriate to impose a constructive trust on those proceeds "even though the person wrongfully receiving the benefit is innocent of collusion," because by "accepting the property" that person "adopts the means by which it was procured."   *Smithberg v. Illinois Mun. Retirement Fund*, 735 N.E.2d 560, 566 (Ill. 2000) (citations omitted).  However, to prevail on a claim under this rule, "[s]trict identification" of the trust fund proceeds is required and the "claimant must prove that his specific funds were used to purchase a specific subsequent asset."  *In re Commissioner of Banks & Real Estate*, 764 N.E.2d 66, 108 (Ill. App. Ct. 2001) (citing G. Bogert & G. Bogert, *Law of Trusts & Trustees* § 921, at 435 (2d ed. 1995)).  The Trustee, standing in the shoes of Jorie as the original constructive trust claimant, bears the burden of tracing the initial investment through to the Michigan Property.  *Id*. at 109; *Sadacca*, 470 N.E.2d at 594.

Although the Trustee's claims against Mrs. Zagotta and the Trust are not specifically characterized as such, the court construes the Trustee's arguments as

36

seeking to recover the traceable proceeds of Jorie's initial investment in CCDM through imposition of a constructive trust on the Michigan Property.  In this case, the requisite analysis would require tracing the funds from that initial investment, which occurred in September 2015, through the various transfers that ultimately resulted in the purchase of the Michigan Property by the Trust on April 30, 2019.  The Trustee has argued that these points are established both by the prior state court order, which he claims should be given preclusive effect in this proceeding, as well as by the undisputed facts established independently in this proceeding.

> i.   Collateral Estoppel Effect of Prior State Court Order.

To begin, the Trustee supports his "traceable proceeds" claim by arguing that the findings reflected in the prior state court orders are entitled to collateral estoppel effect in this proceeding, and that those determinations establish his entitlement to a constructive trust on the Michigan Property.  This argument is not persuasive.  Under Illinois law, issue preclusion, or collateral estoppel, provides that the "adjudication of [a] fact or question" in prior litigation will be deemed "conclusive of the same question in [a] later suit" between the same parties or their privies, even if the second suit involves a different cause of action. *Nowak v. St. Rita High School*, 757 N.E.2d 471, 477 (Ill. 2001).  "The minimum threshold requirements for the application of collateral estoppel are: (1) the issue decided in the prior adjudication is *identical* with the one presented in the suit in question, (2) there was a final judgment on the merits in the prior adjudication, and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication." *Nowak*, 757 N.E.2d at 478.  Although the strict mutuality requirement has been abandoned in certain situations involving issue preclusion, it remains well-established that

37

litigants who never appeared in a prior action may not be bound by factual determinations made in the prior proceeding. *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 329, 91 S. Ct. 1434 (1971) (explaining that estopping a party who "never had a chance to present their evidence and arguments" on an issue would violate due process). The requisite identity of parties and issues presented are both missing in the present case.

First, as the court has already noted, neither Mrs. Zagotta nor her Trust were parties to the prior litigation. The Trustee acknowledges this fact but argues that these non-parties should still be bound by the prior determinations because they were in privity with the Debtor. Under Illinois law, "a party to a case is in privity with a non-party if they have 'the same legal interests'" and the party to the prior lawsuit "'adequately represent[ed]'" those interests. *Arellano v. Leach*, 2015 WL 5883016, *6 (N.D. Ill. Oct. 6, 2015) (unpublished opinion) (quoting *Lutkauskas v. Ricker*, 28 N.E.3d 727, 739 (Ill. 2015)); *see also Taylor v. Sturgell*, 553 U.S. 880, 893-95, 128 S. Ct. 2161 (2008) (analyzing federal preclusion principles and recognizing six categories of exceptions to the general rule against non-party preclusion, including where there is a "pre-existing substantive legal relationship" that might justify preclusion, as with preceding and succeeding owners of property, or assignee and assignor, or instances when the non-party was adequately represented by someone who was a party, as in a class action lawsuit or a suit involving a trustee or other fiduciary). Of the exceptions that might apply and justify non-party preclusion here, the most viable argument is that Mrs. Zagotta and her Trust were successors in interest to the property that was the subject of the original unjust enrichment claim. However, that exception is only applicable "in an action that

determines interests in real or personal property." *Restatement (Second) of Judgments* § 43 (1982). Here, the order purporting to impose a constructive trust on the Illinois Property did not directly transfer title to the property but operated instead as an *in personam* directive requiring the Debtor to do so. *Id*. at § 43 cmt. a ("If the [prior] action is characterized as having involved only the 'personal' rights of the litigants, it does not affect the property itself" and "a person who subsequently acquires property owned by one who was a party to [the] litigation is not bound by the judgment . . . ."). While the Debtor and Mrs. Zagotta may have an overall shared objective of protecting their residence, the Debtor was never the sole owner of either the Michigan or Illinois Property. As such, he cannot be said to have individually had the same legal rights, standing, or defenses that Mrs. Zagotta or her Trust could have asserted in the prior litigation. *Arellano*, 2015 WL 5883016, *6 (in Illinois, "[e]ven tightly analogous interests will not do" to establish non-party privity) (citations omitted). Under the circumstances, the court cannot conclude that the Debtor and Mrs. Zagotta's interests were sufficiently aligned, or that Mrs. Zagotta and her Trust were adequately represented by the Debtor in the prior litigation.

It is also impossible for this court to conclude, on the present record, that the issues that would support imposing a constructive trust on the Michigan Property as traceable proceeds were actually and necessarily decided by the state court. This court believes it is probable that the Illinois court viewed the Michigan Property as having been acquired with proceeds of Jorie's initial investment in CCDM and imposed the constructive trust on that basis. Again, the requisite analysis to support such a conclusion would involve tracing Jorie's initial investment in CCDM through numerous steps which culminated in

39

the purchase of the Michigan Property by the Trust nearly four years later.  There is no evidence in the current record that the state court made any factual findings on those issues.  Had Mrs. Zagotta and the Trust been named as parties in the prior litigation, they would have also been entitled to raise any affirmative defenses they may have had, including that they were bona fide purchasers for value, before a constructive trust was imposed on property they owned.  They were not afforded that opportunity.  In short, the prior state court orders are not entitled to issue preclusive effect in this proceeding and would not fully answer the questions currently before this court, even if they were.

ii.  Stand-Alone Traceable Proceeds Claim.

Although the prior state court orders are not entitled to collateral estoppel effect in this proceeding, the Trustee might still prevail on the claims he asserts as Jorie's assignee if he can independently establish that the Michigan Property represents traceable proceeds of the original unjust enrichment and that imposing a constructive trust on the property is appropriate for that reason.  As the court previously noted, this claim is suggested, but not clearly articulated, in the Trustee's pleadings.  For that reason, the court believes there are many legal issues surrounding this claim that have not been fully addressed by the parties.  Chief among these issues is the potential affirmative defense Mrs. Zagotta and her Trust could assert regarding their status as bona fide purchasers of the property.[18]

---

[18]    This court makes no finding on how likely Mrs. Zagotta, who clearly contributed value to the Defendants' household but who did not make a direct financial contribution to acquisition of the property at issue, would be to prevail on any such bona fide purchaser defense. *Compare In re Marriage of Allen*, 724 P.2d 651, 659 (Colo. 1986) (en banc) (noting that "many courts have refused to recognize bona fide purchaser status in the spouses of persons who have misappropriated property") *with Fidelity & Deposit Co. of Maryland v. Stordahl*, 91 N.W.2d 533, 536 (Mich. 1958) (finding that spouse who contributed to down payment and did considerable

Ultimately, however, the parties and the court do not need to confront these difficult legal issues, because based on the undisputed facts in this case, the Trustee has not shown an ability to meet his burden on the tracing issues as a matter of law. To begin, it is important to reiterate that a constructive trust is a device aimed at "vindicating equitable ownership" interests by requiring the holder of legal title to specific property to "yield ownership" of all, or an identifiable part, of the asset to the equitable owner. *Restatement (Third) of Restitution & Unjust Enrichment* § 55 cmt. a & k. This distinguishes a constructive trust from other remedies such as an equitable lien, which secures a money judgment by giving the claimant a lien on particular property but does not result in a change in ownership of the asset. *Id*. at cmt. k; *see also* Dan B. Dobbs & Caprice L. Roberts, *Law of Remedies: Damages, Equity, Restitution* § 4.3(3) (3d ed. 2018) (explaining that an equitable lien may be appropriate when constructive trust would be an "overkill – in other words, when the property to which it attaches belongs only partly to [the] plaintiff").

In this proceeding, the only remedy the Trustee has requested is a constructive trust on the Michigan Property as a whole. The sole argument made in support of this assertion in the Trustee's summary judgment brief is that "[t]he Michigan Property was purchased with the proceeds of the Illinois Property" and that the "Illinois Property, in turn was purchased with the proceeds of Jorie's 'investment' in CCDM."[19] While the court could possibly infer that this broad statement is generally true, that is not the appropriate

---

work improving property was "clothed with the protection" generally afforded to bona fide purchasers).

[19]    *See* Trustee's Brief in Support of Motion for Summary Judgment, AP Dkt. No. 46, at p. 14.

standard, particularly when Mrs. Zagotta was not culpable for the original unjust enrichment.  *See Restatement (Third) of Restitution & Unjust Enrichment* § 58 cmt. e (suggesting that the "stringency of the tracing requirement" may depend "on the nature of the opposing interests in a particular case").  Instead, it is the Trustee's burden to strictly identify how the specific proceeds of Jorie's investment were used to purchase the Michigan Property.  The undisputed facts in the summary judgment record demonstrate that the Trustee has fallen short of meeting that burden.

The Defendants originally purchased the Illinois Property for $949,000 in October 2015.  The parties agree that $895,000 of the purchase price was paid with funds from the Debtor's law office bank account, where some of the proceeds of Jorie's CCDM investment had been deposited approximately two weeks earlier.  However, the Defendants also made a $50,000 earnest money deposit, the exact origins of which are not known.  After acquiring the Illinois Property, the Defendants made numerous improvements to the property.  Although the parties agree that these improvements were paid for using funds from the Debtor's law firm account as well as the Defendants' personal checking account, there is no evidence that any of these funds were directly traceable to Jorie's investment.  After the Illinois Property was transferred to the Trust, the Trust sold the property for $1,135,000, which is significantly more than the Defendants paid for it.  It is clear that the value of the real property at this time was attributable not only to Jorie's investment, but also to the Defendants' earnest money deposit, the improvements they made between 2015 and 2019, and arguably to general appreciation.  In addition, when the Illinois Property was sold, almost $300,000 of the sale proceeds were used to pay off a loan that had been obtained by the Debtor; there is no evidence in

42

the record to show whether this $300,000 was paid from funds received at the sale that were traceable to Jorie's investment, the deposit, the improvements, or any other source. Approximately $723,000 of the sale proceeds were then put toward the purchase of the Michigan Property. However, the total purchase price for the Michigan Property was $760,000, and the settlement statement shows that the Defendants again contributed an earnest money deposit, the source of which is not disclosed in the record.

As this recitation demonstrates, the direct factual links between Jorie's investment and the full value of the Michigan Property break down at several critical points. Again, as the party bearing the burden of proof on the tracing issues, it was the Trustee's obligation to come forward with specific facts that could lead a rational trier of fact to find in his favor. Here, even if one focuses only on the two earnest money deposits, which have not been (and in the case of the deposit on the Michigan Property, likely cannot be) traced to the Jorie investment, the undisputed facts lead to the opposite conclusion: that the Trustee is not entitled to a constructive trust on the Michigan Property as a whole, which is the only relief he has requested. At this advanced stage in the proceeding, the Trustee has not provided any evidence suggesting the chain was not broken at these critical points, nor has he articulated any legal theories or presumptions that would permit the court to disregard these breaks in the chain. Finally, the court reiterates that the Trustee has not requested any relief, such as an equitable lien, for anything less than the full value of the Michigan Property. The court makes no findings on whether the Trustee could succeed on such a hypothetical claim, but merely concludes that the Trustee has not done so on the present record. In short, even if general equitable principles permit imposition of a constructive trust on property held by third parties like Mrs. Zagotta and

43

her Trust, who were in no way culpable for the original unjust enrichment, the court finds that those equitable principles would not be served by imposing a constructive trust in this case, where the Michigan Property was acquired three and a half years after Jorie's initial investment and the full value of that property cannot be directly linked to Jorie's funds.

For all of these reasons, the court finds that the claims asserted by the Trustee as Jorie's assignee – including those for turnover under the prior state court order and those for imposition of a "new" constructive trust on the Michigan Property – are not sustainable as a matter of law. The Defendants' request for summary judgment on these claims shall be granted.

2.  *Trustee in the Debtor's Shoes*.

The Trustee's second argument seeks the imposition of a constructive trust on the Michigan Property based upon the assertion that Mrs. Zagotta and her Trust were unjustly enriched at the Debtor's expense by the purchase and transfer of the property interests at issue. It is well-established that, upon the filing of a chapter 7 case, the trustee has the exclusive authority to "stand in the shoes of the debtor" and pursue any prepetition causes of action the debtor "could have brought had he not filed a petition for bankruptcy." *Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 277 F.3d 838, 853 (6th Cir. 2002); *see In re Tamarack Dev. Assocs., LLC*, 611 B.R. 286, 295 (Bankr. W.D. Mich. 2020) (stating the well-settled principle that causes of action belonging to the debtor become property of the estate under § 541(a)(1)). The Trustee is seeking to do precisely that here, by arguing that he may stand in the Debtor's shoes and pursue claims for unjust enrichment and imposition of a constructive trust against Mrs. Zagotta and her Trust for the benefit of the bankruptcy estate. As the Trustee correctly points out, recent caselaw from the United

44

States Bankruptcy Court for the Eastern District of Michigan suggests that allowing the chapter 7 trustee to seek to "augment the bankruptcy estate by pursuing the pre-petition claim" of the debtor for imposition of a constructive trust based on unjust enrichment does not run afoul of the "bankruptcy policy of ratable distribution" and is thus permissible under Sixth Circuit precedent, including *XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.),* 16 F.3d 1443 (6th Cir. 1994). *See Miller v. Short (In re Short)*, 625 B.R. 678, 693 (Bankr. E.D. Mich. 2021) (trustee stated a plausible claim for imposition of constructive trust on property held solely by debtor's non-filing spouse)*; see also Nathan v. deBruin (In re deBruin)*, 2022 WL 828299 (Bankr. E.D. Mich. Mar. 18, 2022) (granting summary judgment because trustee failed to show that defendants were unjustly enriched at the debtor's expense).  This court agrees with that general conclusion.

However, to prevail on an unjust enrichment claim under Michigan law, the Trustee must establish:  (1) that Mrs. Zagotta or her Trust received a benefit from the Debtor and (2) an inequity resulting to the Debtor because of the retention of the benefit by Mrs. Zagotta or the Trust. *Morris Pumps v. Centerline Piping, Inc*., 729 N.W.2d 898, 904 (Mich. Ct. App. 2006).  A constructive trust is among the equitable remedies that "may be imposed" when necessary "to do equity or to prevent unjust enrichment." *Kammer Asphalt Paving Co. v. East China Township Schools*, 504 N.W.2d 635, 641 (Mich. 1993). "[S]uch a trust may be imposed when property 'has been obtained through fraud, misrepresentation, concealment, undue influence, duress, taking advantage of one's weakness, or necessities, or any other similar circumstances which render it unconscionable for the holder of the legal title to retain and enjoy the property.'" *Id*. (quoting *Potter v. Lindsay*, 60 N.W.2d 133 (Mich. 1953)); *see also In re Wright*, 642 B.R.

45

172, 178 (Bankr. E.D. Mich. 2022) (declining to impose constructive trust on property transferred between spouses, in part due to lack of evidence that the transfer occurred through fraud, concealment, or other circumstances which made it unconscionable).

In this case, although Mrs. Zagotta and the Trust arguably received some benefit from the transfers that gave them their ownership interests in the Illinois and Michigan Property at the expense of the Debtor, there is absolutely no evidence in the record to support a finding that it was unjust or unconscionable for Mrs. Zagotta or her Trust to retain those benefits. There is similarly no basis for imposing a constructive trust given the complete absence of evidence showing that Mrs. Zagotta persuaded the Debtor to purchase the Illinois Property as tenants by the entirety or transfer it to her Trust by fraud, misrepresentation, concealment, undue influence, or any other unconscionable conduct. To the contrary, the uncontested evidence before this court establishes that both transfers were undertaken by the Debtor on a voluntary basis and for generally permissible purposes. Both the Debtor and Mrs. Zagotta testified in their depositions that they initially purchased the Illinois Property as tenants by the entirety to accommodate their growing family. The Debtor also stated that he believed the family could afford that purchase because of the CCDM deal. The state court's subsequent finding that the Debtor was not aware of the fraud surrounding the purported IBM contract supports the Debtor's explanation on this point. In short, although the initial purchase of the Illinois entireties property had a detrimental effect on the Debtor's creditors – and may have even been avoidable as an actual or constructive fraudulent transfer, but for the statute of limitations and heightened legal standard that applies under Illinois law – it cannot be said that the transfer was unjust to the Debtor. The transfer of the Illinois Property to the Trust also

46

appears to have been undertaken for legitimate estate planning purposes.  Considering the overall circumstances of the transfers at issues, the court cannot conclude that it is unjust or inequitable for the Trust to retain the Michigan Property, even if it does so at the Debtor's expense.

IV.    CONCLUSION.

Although the issues presented in this adversary proceeding are extremely complex, the circumstances that led the parties to this point are really quite ordinary. Koplin was a sophisticated businessman who, through Jorie, made a bad investment in CCDM.  The Debtor, whose knowledge of the fraudulent IBM contract remains questionable, used a portion of Jorie's funds to purchase a home with his wife as tenants by the entirety.  They later made the decision to transfer ownership of the home to Mrs. Zagotta's Trust as part an estate planning strategy that was recommended by their attorney.  Ultimately, they moved to Michigan and the Debtor filed this bankruptcy case. The Trustee, as the representative of the bankruptcy estate, understandably views the transfers that occurred between the Debtor and Mrs. Zagotta as suspicious and potentially inequitable.  However, due to circumstances entirely outside of the Trustee's control – including the timing of the transfers and the unique features of Illinois law – the normal means of challenging the transfers as fraudulent are not available in this case. Recognizing those potential obstacles, the Trustee asks this court to impose a constructive trust on the Michigan Property.  That equitable remedy, which the court views as appropriate in only the most egregious and compelling circumstances, is simply not warranted in this case, where Mrs. Zagotta and her Trust acquired their property interests

47

in ordinary transactions and the full value of that property cannot be directly traced to the original unjust enrichment.

For all these reasons, the Trustee's motion for summary judgment is denied, the Defendants' cross motion is granted, and the complaint in this adversary proceeding is dismissed.  A separate order shall be entered accordingly.

**IT IS SO ORDERED.**

**Dated February 9, 2023**



James W. Boyd
United States Bankruptcy Judge